Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Sean Gorton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co.,
GEICO Indemnity Co., GEICO General Insurance Company
and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE   COMPANY and GEICO CASUALTY
COMPANY,

                             Plaintiffs,

                -against-

VALERIY SABODASH, M.D.,
ANETTA KALSIN,
VALERIY KOTLYAR,
CLOUD BILLING, INC., and
JOHN DOE DEFENDANTS "1" – "10",

                        Defendants.
-----------------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiffs Demand a Trial by
Jury**

## COMPLAINT

      Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants, Valeriy Sabodash, M.D., Anetta

Kalsin, Valeriy Kotlyar, Cloud Billing, Inc., and John Doe Defendants "1" through "10"

(collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $107,380.00 that the Defendants wrongfully obtained from GEICO and to extinguish more than $911,500.00 in pending fraudulent billing resulting from the submission of thousands of fraudulent No-Fault insurance charges through an unincorporated medical practice using the name of Valeriy Sabodash, M.D. ("the unincorporated medical practice").  The fraudulent No-Fault insurance charges include excessive and medically unnecessary diagnostic testing services, including initial examinations, electromyography tests ("EMGs") and nerve conduction velocity tests ("NCVs") (collectively the "Fraudulent Services") purportedly rendered to individuals involved in automobile accidents and eligible for coverage under policies of automobile insurance issued by GEICO ("Insureds").

2.     The Defendants' submission of fraudulent charges was part of a scheme involving a licensed physician, Valeriy Sabodash, M.D. ("Sabodash"), who resided in Florida but "sold" his medical license to unlicensed laypersons in New York, including Anetta Kalsin ("Kalsin"), Valeriy Kotlyar ("Kotlyar"), and John Doe Defendants 1-10, so that the laypersons could secretly and unlawfully control and profit from Sabodash's unincorporated medical practice, which maintained no stand-alone practice, had no patients of its own, and provided no legitimate or medically necessary services.

3.     Sabodash's unincorporated medical practice, under the control of the unlicensed laypersons, operated on an itinerant basis traveling to the offices of numerous multidisciplinary No-Fault medical clinics (the "Clinics") which, pursuant to a fraudulent scheme involving pre-determined treatment and billing protocols, provided Sabodash's unincorporated medical practice with referrals and access to the Clinics' patient bases.  The Defendants then used

Sabodash's unincorporated medical practice to bill New York automobile insurers, including GEICO, for the Fraudulent Services.

4.      Sabodash, knowing that he was not in actual control of the unincorporated medical practice, conspired with unlicensed laypersons, Kalsin, Kotlyar, Kalsin's company – Cloud Billing, Inc. ("Cloud Billing") – and John Doe Defendants 1-10 (collectively, the "Management Defendants"), to enable Sabodash's unincorporated medical practice to receive a steady stream of "patients" through illegal kickbacks, fee splitting, and referral arrangements with the Clinics.   Through these illegal arrangements, the Defendants billed inflated and excessive charges for the Fraudulent Services, all performed pursuant to a fraudulent, pre-determined protocol designed and employed by the Defendants to maximize the potential charges that they could submit to insurers, without regard to the actual needs of the patients.

5.      As a result of the Defendants' fraudulent scheme, GEICO seeks to recover monies stolen from it, amounting to at least $107,380.00, as well as a declaration in this action that GEICO is not legally obligated to pay reimbursement of more than $911,500.00 in pending New York No-Fault insurance claims that have been submitted by or on behalf of Sabodash's unincorporated medical practice because:

(i)      Valeriy Sabodash, M.D. is an unincorporated medical practice that was fraudulently owned and/or controlled by non-physicians, and split fees with them, in violation of New York law and, therefore, is ineligible to seek or recover No-Fault benefits;

(ii)     the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

     (iv)    the Fraudulent Services were provided – to the extent they were provided at all – pursuant to illegal fee-splitting and kickback arrangements among the Defendants and the owners and controllers of the multidisciplinary Clinics where the Defendants purported to provide the Fraudulent Services; and

     (v)    in many cases, the Fraudulent Services were provided – to the extent they were provided at all – by independent contractors.

6.     The Defendants fall into the following categories:

     (i)    Sabodash is a licensed physician licensed to practice medicine in the State of New York and Florida who has served as the nominal owner of the unincorporated medical practice;

     (ii)    The Management Defendants include Defendants Kalsin, Kotlyar, Cloud Billing, and John Doe Defendants 1-10 who have never been licensed healthcare professionals.  Even so, they secretly and unlawfully owned and/or controlled the unincorporated medical practice in contravention of New York law, engaged in illegal kickback, fee splitting, and referral relationships as part of the fraudulent scheme, and directed and implemented pre-determined fraudulent protocols designed solely to financially enrich the Defendants.

7.     As discussed below, the Defendants at all relevant times have known that: (i) the unincorporated medical practice has been owned and/or controlled by non-physicians; (ii) the unincorporated medical practice split fees with non-physicians in contravention of New York law; (iii) the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; (v) the Fraudulent Services were provided – to the extent they were provided at all – pursuant to illegal fee-splitting and kickback arrangements among the Defendants and the owners and controllers of the Clinics where the Defendants

4

purported to provide the Fraudulent Services; and (vi) many of the Fraudulent Services were provided – to the extent they were provided at all – by independent contractors, rather than by employees of the unincorporated medical practice, in violation of New York law.

8.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the unincorporated medical practice.   The chart annexed hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

9.     The Defendants' fraudulent scheme began as early as 2018 and has continued uninterrupted through the present day in that the Defendants continue to seek collection on the fraudulent billing.

## THE PARTIES

### I.     Plaintiffs

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland.   GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

11.     Defendant Sabodash resides in and is a citizen of Florida.

12.     Sabodash was licensed to practice medicine in Florida on March 6, 2014, and was licensed to practice medicine in New York on April 4, 2018.

13.     Defendant Kotlyar resides in and is a citizen of New York.

14.     Kotlyar was licensed as an EMG/NCV technician on December 6, 2009 and purported to provide many of the Fraudulent Services.

15.     Kotlyar has never been a licensed medical professional, yet secretly and unlawfully owned and/or controlled the unincorporated medical practice in contravention of New York law, engaged in illegal kickback, fee splitting, and referral relationships as part of the fraudulent scheme, and directed and implemented a pre-determined fraudulent treatment protocol designed solely to financially enrich the Defendants.

16.     Defendant Kalsin resides in and is a citizen of New York.

17.     Kalsin has never been a licensed medical professional, yet secretly and unlawfully owned and/or controlled the unincorporated medical practice in contravention of New York law, engaged in illegal kickback, fee splitting, and referral relationships as part of the fraudulent scheme, and directed and implemented a pre-determined fraudulent treatment protocol designed solely to financially enrich the Defendants.

18.     Cloud Billing is a company incorporated in New York on or about May 24, 2018, with its principal place of business in Brooklyn, New York.

19.     Cloud Billing purports to be a company that provided billing services to the unincorporated medical practice but, in actuality, has been used by the Management Defendants to unlawfully own and/or control the unincorporated medical practice in contravention of New York law, engage in illegal kickback, fee splitting, and referral relationships as part of the fraudulent scheme, and direct and implement a pre-determined fraudulent treatment protocol designed solely to financially enrich the Defendants.

20.     Upon information and belief, John Doe Defendants 1-10 reside in and are citizens of New York, and are individuals and entities whose names are not yet known to GEICO.  John

Doe Defendants 1-10 at all times have conspired and participated in the fraudulent and unlawful scheme alleged in this Complaint, including unlawfully owning and/or controlling the unincorporated medical practice in contravention of New York law, engaging in illegal kickback, fee splitting, and referral relationships as part of the fraudulent scheme, and directing and implementing a pre-determined fraudulent treatment protocol designed solely to financially enrich the Defendants.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the No-Fault Laws and Licensing Statutes**

23.     GEICO underwrites automobile insurance in New York.

24.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

25.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

26.     An Insured can assign his/her right to No-Fault Benefits to healthcare goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

27.     Pursuant to the No-Fault Laws, a healthcare practice is not eligible to bill for or to collect No-Fault Benefits if it fails to meet any New York State or local licensing requirement necessary to provide the underlying services.

28.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York… .

29.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services.  Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a healthcare practice;

(iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

30.     New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals.

31.     Pursuant to Education Law §§ 6512, 6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

32.     Pursuant to Education Law § 6509-a, it is professional misconduct under certain circumstances for a licensee to "directly or indirectly" request, receive, or participate in the division, transference, assignment, rebate, splitting, or refunding of a fee.

33.     Pursuant to 8 N.Y.C.R.R. § 29.1(b)(3) a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

34.     Pursuant to Education Law § 6530(19), it is professional misconduct under certain circumstances for a licensee to permit any person to share in fees for professional services.

35.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

36.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits.  There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant … shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

37.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services.  Under the No-Fault Laws, a healthcare practice is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the practice, such as independent contractors.

38.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

39.     When a healthcare service provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

40.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

### A.      An Overview of the Fraudulent Scheme

41.     Beginning in 2018, the Defendants masterminded and implemented a fraudulent scheme in which Valeriy Sabodash, M.D. – an unincorporated medical practice nominally owned by Sabodash, but actually illegally owned and/or controlled by Kotlyar, Kalsin, and the other Management Defendants – has been used to bill the New York automobile industry millions of dollars that the Defendants never were eligible to receive.

42.     Despite purporting to be a legitimately owned and operated healthcare practice, the unincorporated medical practice has at all times been illegally owned and/or controlled by unlicensed laypersons and provided no legitimate or medically necessary services.

43.     The unincorporated medical practice has never operated or maintained a stand-alone medical practice; has had no internet website; has not advertised to the public for patients; and has never been the owner or primary leaseholder of the real property from which it purportedly provided the Fraudulent Services to Insureds.

44.     Instead, the unincorporated medical practice, under the control of Kalsin, Kotlyar, and the other Management Defendants, traveled to the offices of numerous multidisciplinary "clinics" located throughout Brooklyn and the New York City area (the "Clinics") where, in exchange for kickbacks or payments for referrals to the Clinics, the unincorporated medical practice gained access to the patients of these Clinics, which in turn permitted the Defendants to bill for the Fraudulent Services under the name of the unincorporated medical practice.

45.     Many of the Clinics operate under the illegal direction and control of unlicensed laypersons, who create and cultivate a patient base through illegal payments and then subject the patients to a laundry list of medically unnecessary services by providers like the unincorporated medical practice, in order to generate profits without regard to genuine patient care.

**B.     The Fraudulent Operation of Valeriy Sabodash, M.D.**

46.     To begin the fraudulent scheme, Kotlyar, Kalsin, and the other Management Defendants recruited Sabodash, who was willing to "sell" his license to them so that the Management Defendants could use the unincorporated medical practice to submit fraudulent billing to GEICO and other New York automobile insurers, in 2018.

47.     Defendant Kotlyar is no stranger to illegally controlling healthcare practices, as he has illegally controlled a number of transient healthcare practices over the years.

48.     In fact, Kotlyar has been named as a defendant in at least three separate federal lawsuits for virtually identical conduct.  See Government Employees Insurance Co., et al v. Cecile I. Fray, M.D., PLLC, et al., Dkt. No. 1:19-cv-04881(RRM)(SMG) (E.D.N.Y. 2019); Government Employees Insurance Co., et al v. Marina Galea, M.D., et al, Dkt. No. 1:19-cv-00663(ARR)(RML) (E.D.N.Y. 2019); Government Employees Insurance Co., et al v. Bennet Medical, P.C., et al., Dkt. No. 1:18-cv-03084(NGG)(PK) (E.D.N.Y. 2018).

49.     In exchange for a designated salary or other form of compensation, Sabodash agreed to falsely represent that he truly owned and controlled the unincorporated medical practice.  Sabodash did this knowing that the unincorporated medical practice would be used to submit fraudulent billing to insurers.

50.     Once the unincorporated medical practice began operating, Sabodash ceded true beneficial ownership and control over the unincorporated medical practice to the Management

12

Defendants, who then used the unincorporated medical practice to render the Fraudulent Services under the control of the Management Defendants.

51. The Management Defendants – rather than Sabodash – provided all start-up costs and investment in the unincorporated medical practice.

52. Sabodash has exercised no genuine ownership or control over the unincorporated medical practice or the profits that have been generated from the unincorporated medical practice.

53. Once it began operating, the unincorporated medical practice did not advertise for patients and did virtually nothing as would be expected of a legitimate medical "practice" to develop its reputation and attract patients.

54. Sabodash never marketed the unincorporated medical practice's existence to the general public, did not advertise for patients, and did nothing to build name recognition to draw legitimate business.

55. In fact, Sabodash spent the majority of each month in Florida while the unincorporated medical practice purported to exclusively treat patients in New York.

56. After it began operating, Kalsin, Kotlyar, and the other Management Defendants arranged for the unincorporated medical practice to almost immediately begin evaluating and testing steady volumes of patients (using an assortment of per diem physicians and technicians) at various Clinics in exchange for kickbacks to the owners of the Clinics.

57. While Sabodash purports to own and control the unincorporated medical practice, his ownership has been nothing but a sham, as he has done virtually nothing that would be expected of the owner of a legitimate medical practice to develop its reputation, attract patients, and provide patient care.

58.    The unincorporated medical practice, under the control of the Management Defendants, subjected Insureds to medically unnecessary EMG/NCV tests that in no way aided in the assessment or treatment of the Insureds and that was designed solely to financially enrich the Defendants.

59.    Sabodash has never been in control of the patient base at the unincorporated medical practice.

60.    Sabodash has never been in control of the healthcare services that were provided under the unincorporated medical practice's name.

61.    Throughout the course of Sabodash's relationship with the Management Defendants, all decision-making authority relating to the operation and management of the unincorporated medical practice has been vested entirely with Kotlyar, Kalsin, and the other Management Defendants.  In reality, Sabodash has been nothing more than a de facto employee of the Management Defendants.

62.    The true, ownership, management, and control of the unincorporated medical practice has rested entirely, at all times, with Kotlyar, Kalsin, and the other Management Defendants, who have used the façade of the unincorporated medical practice to do indirectly what they are forbidden from doing directly, namely, to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

63.    Sabodash has been nothing more than a nominal or "paper" owner of the unincorporated medical practice and has no genuine ownership or control over the health care services provided by, or the profits generated from, the unincorporated medical practice.

64.     Kotlyar, Kalsin, and the other Management Defendants at all times maintained complete control over the unincorporated medical practice's billing and ultimately all revenues realized by the unincorporated medical practice, which they siphoned to themselves.

65.     To conceal the illegal fee splitting and siphoning away of the revenues to the Management Defendants, while simultaneously effectuating pervasive, total control over the unincorporated medical practice's operation and management, the Management Defendants arranged to have the unincorporated medical practice enter into purported "billing", "personnel", "service", and/or "management" arrangements with them and their associates.

66.     For example, the unincorporated medical practice purported to have a legitimate agreement with Cloud Billing, which is owned and controlled by Kalsin and was incorporated less than one month before the unincorporated medical practice began operating, for purported billing services.

67.     Kalsin, on the one hand, was siphoning the profits of the unincorporated medical practice to the Management Defendants through the bogus agreement with Cloud Billing, while at the same time Kalsin was siphoning monies directly from the unincorporated medical practice for other services she purportedly provided to the unincorporated medical practice.

68.     The agreements and financial arrangements between the unincorporated medical practice and the Management Defendants, including the arrangements with Cloud Billing, were not legitimate agreements but instead called for exorbitant payments from the unincorporated medical practice to the Management Defendants, regardless of the actual value of the services provided.

69.     While the financial agreements and arrangements between the unincorporated medical practice and the Management Defendants ostensibly were created for purportedly

legitimate services, they were actually used solely as a tool to permit them to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally control the unincorporated medical practice; and (ii) siphon to themselves the profits that were generated by the billings submitted to GEICO and other insurers through the unincorporated medical practice.

**C.    The Illegal Kickback and Referral Relationships with the Clinics**

70.    Sabodash did not market the unincorporated medical practice's existence to the general public, did not advertise for patients, never sought to build name recognition to draw legitimate business, and did virtually nothing that would be expected of the owner of a legitimate medical practice to develop its reputation and attract patients.

71.    Instead, Kotlyar and Kalsin arranged for the unincorporated medical practice to operate from a series of multidisciplinary No-Fault clinics, (i.e., the Clinics) including, but not limited to, the Clinics at the following locations:

       (i)      2363 Ralph Avenue, Brooklyn;

       (ii)     625 East Fordham Road, Bronx;

       (iii)    2589 Third Avenue, Bronx;

       (iv)     550 Remsen Avenue, Brooklyn;

       (v)      615 Seneca Avenue, Ridgewood;

       (vi)     3209 Fulton Avenue, Brooklyn;

       (vii)    108 Kenilworth Place, Brooklyn;

       (viii)   1552 Ralph Avenue, Brooklyn;

       (ix)     9801 Foster Avenue, Brooklyn; and

       (x)      176 Wilson Avenue, Brooklyn.

72.     Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of these Clinics are known to operate under the unlawful ownership and control of unlicensed laypersons and are actually nothing more than multidisciplinary medical mills organized to be convenient one-stop shops of No-Fault insurance fraud.

73.     In fact, GEICO has received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

74.     For example, GEICO has received billing for purported healthcare services rendered at the clinic located at 2363 Ralph Avenue, Brooklyn, New York from a "revolving door" of approximately 50 different healthcare providers.

75.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic located at 176 Wilson Avenue, Brooklyn, New York from a "revolving door" of approximately 40 different health care providers.

76.     Furthermore, GEICO has received billing for purported healthcare services rendered at the clinic at 550 Remsen Avenue, Brooklyn, New York from a "revolving door" of approximately 100 health care providers.

77.     Furthermore, GEICO has received billing for purported healthcare services rendered at the clinic at 1552 Ralph Avenue, Brooklyn, New York from a "revolving door" of approximately 60 health care providers.

78.     Similarly, GEICO has received billing for purported healthcare services rendered at the clinic at 615 Seneca Avenue, Ridgewood, New York from a "revolving door" of approximately 100 health care providers.

79.     Moreover, regarding purported healthcare services rendered at some of the same Clinics where Sabodash's unincorporated medical practice operated, at least one physician has advised GEICO that billing and treatment records submitted to GEICO using that physician's name and tax identification number were false in that he never provided or authorized the services and never authorized the use of his name, license or tax identification number.

80.     In the instant matter, the owners and controllers of the Clinics arranged for Insureds who presented to the Clinics to be referred to the unincorporated medical practice in exchange for payments, i.e., kickbacks, from the Defendants.

81.     The kickbacks that the Defendants paid to the Clinics' owners and controllers were disguised as ostensibly legitimate fees to "rent" space from the Clinics. The monies, disguised as rent, were delivered to the various Clinics by Kalsin.

82.     In actuality, the purported rental fees were "pay-to-play" arrangements that caused the Clinics to steer Insureds to the unincorporated medical practice, with the fee amount based upon the volume of Insureds that was expected to be referred to the unincorporated medical practice for "testing".

83.     The purported rent payments to the Clinics were not consistent with any actual, legitimate, rental arrangements.  Instead, the purported "rent" payments by the unincorporated medical practice were made in exchange for access to the existing patient base at the Clinics.

84.     The real purpose of the sham "rent" payments was to allow the unincorporated medical practice to access the patient base at the Clinics.

85.     In exchange for the "rent" payments (*i.e.*, kickbacks) received from the unincorporated medical practice, when an Insured visited one of the Clinics, he or she was automatically referred to the unincorporated medical practice for purported consultations and testing with physicians working under the name of the unincorporated medical practice.

86.     The referrals to the unincorporated medical practice were made without regard for the necessity of the testing or the Insureds' individual symptoms or presentation. Indeed, at virtually all of the Clinics, the Insureds had already been subjected to multiple other medical and chiropractic evaluations, a myriad of treatments, and a host of other diagnostic tests, which rendered the evaluations and diagnostic tests performed by the unincorporated medical practice superfluous and provided solely for financial gain.

87.     But for the payment of kickbacks, the unincorporated medical practice would not have had access to the Clinics and the Insureds.

88.     The unincorporated medical practice, like other medical practices illegally owned and controlled by unlicensed laypersons, has never been a legitimate medical practice, but has simply been one of many fraudulent entities operating on a transient basis that open and close over short periods, in order to limit the volume of billing submitted through any single entity, avoid any scrutiny connected to the payments of kickbacks for patient referrals, and to otherwise conceal the fraudulent schemes exploiting the patient base at the Clinics.

89.     In fact, as previously discussed, Kotlyar has been associated with numerous other suspect healthcare providers billing for diagnostic testing services, and the unincorporated medical practice is merely one of the latest of such providers utilized to submit fraudulent billing to insurers from the Clinics.

90.    In keeping with the fact that the unincorporated medical practice has been used as one of a number of medical practices to submit fraudulent billing for purported diagnostic testing, Jean Baptiste-Simeon, M.D. ("Simeon"), who, together with Kotlyar, purported to perform diagnostic testing on many of the GEICO Insureds allegedly treated by the unincorporated medical practice, has been listed as a treating physician on bills submitted to GEICO by at least 20 other professional corporations submitting billing under New York's No-Fault law.  Simeon also has been named as a defendant in at least three other insurance fraud cases involving similar transient diagnostic testing providers filed in the United States District Court for the Eastern District of New York.

**D.    The Defendants' Fraudulent Testing and Billing Protocol**

91.    In furtherance of the fraudulent scheme, the Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol, rendered under the name of the unincorporated medical practice, without regard to the genuine needs of the patient.

92.    The Defendants imposed the pre-determined treatment protocol on virtually all Insureds, regardless of the nature of the accidents or the actual medical needs of the Insureds, and regardless of the Insureds' individual symptoms or presentation.

93.    Specifically, the Defendants purported to subject virtually every Insured to a medically unnecessary examination followed by medically unnecessary electrodiagnostic nerve testing under the name of the unincorporated medical practice.  This was done regardless of whether the Insured had already received other evaluations, treatments, and diagnostic tests performed within weeks of the diagnostic nerve testing allegedly performed by the unincorporated medical practice.

94.     No legitimate healthcare professional, exercising independent medical judgment, would have permitted the fraudulent testing and billing protocol described below to proceed under his or her auspices.

### i.     The Fraudulent Initial Examinations

95.     Once the Insureds were delivered to the unincorporated medical practice by virtue of the kickbacks that the Defendants paid to the owners and controllers of the Clinics, the Defendants purported to provide every Insured with an initial examination.

96.     The Defendants performed the initial examinations – to the extent they were performed at all – solely to provide Insureds with predetermined diagnoses to allow the Defendants to then provide and bill for medically unnecessary or illusory electromyography tests ("EMGs") and nerve conduction velocity tests ("NCVs") (together, "EDX tests") through the unincorporated medical practice

97.     The Defendants customarily billed the initial examinations to GEICO using Current Procedural Terminology ("CPT") code 99204 resulting in a charge of $148.69.

98.     CPT code 99204 is described in the New York State Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, as follows:

> Office or other outpatient visit for the evaluation and management of a new patient, which requires these 3 key components: A comprehensive history; A comprehensive examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.   Usually, the presenting problem(s) are of moderate to high severity.   Physicians typically spend 45 minutes face-to-face with the patient and/or family.

99.     The Defendants' charges for the initial examinations were fraudulent in that: (i) the initial examinations were medically unnecessary and were performed pursuant to the illegal kickbacks that the unincorporated medical practice paid to the Clinics; (ii) the CPT code the

Defendants billed misrepresented the extent of the initial examinations and the nature of the underlying service; (iii) the initial examination reports misrepresented the nature, extent, and complexity of the Insureds' injuries; and (iv) the initial examinations virtually never took 45 minutes to perform, to the extent that they were performed at all.

100.    Additionally, Valeriy Sabodash, M.D.'s reports and bills are generic, boilerplate documents that do not identify the necessity for the examination, and contain no evidence that the opinions and services allegedly provided by the unincorporated medical practice were ever incorporated into the patients' treatment plans.

101.    The Defendants' charges for the examinations under CPT code 99204 also were fraudulent in that they misrepresented the nature of the underlying service.

102.    According to the Fee Schedule, the use of CPT code 99204 requires that the Insured presented with problems of moderate-to-high severity.

103.    By contrast, to the limited extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

104.    Even so, the Defendants routinely billed for initial examinations under CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate-to-high severity.

105.    The Defendants routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity.

106.    The Defendants also routinely falsely represented that the Insureds presented with problems of moderate-to-high severity in order to create a false basis for the EDX tests that the Defendants purported to provide to the Insureds.

107.    What is more, even though the Insureds almost never presented with problems of moderate-to-high severity as the result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate-to-high severity, the deficient initial examinations performed were incapable of assessing and/or diagnosing problems of such severity.

108.    In addition, the use of CPT code 99204 typically requires that the physician spend 45 minutes of face-to-face time with the Insured or the Insured's family.  Though the Defendants routinely billed for the initial examinations under CPT code 99204, no medical professional associated with the Defendants spent 45 minutes with any Insured during the initial examinations.

109.    In keeping with the fact that the initial examinations allegedly provided by the Defendants did not entail 45 minutes of face-to-face time with the Insureds or their families, the template examination forms used by the Defendants in purporting to conduct the initial examinations set forth a limited range of examination parameters.

110.    The only face-to-face time between examining physicians and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.  These brief interviews and limited examinations did not entail 45 minutes of face-to-face time with the Insureds or their families.

111.    In their claims for initial examinations, the Defendants falsely represented that the examinations involved at least 45 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at a higher rate than examinations that require less time to perform.

112.    Furthermore, the Defendants routinely falsely represented that their initial examinations involved medical decision-making of "moderate to high complexity". In actuality, the initial examinations did not involve any such decision-making because: (i) the Insureds never presented with injuries or symptoms that would necessitate decision making of moderate-to-high complexity; and (ii) in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

113.    To the contrary, the outcome of all of the initial examinations was pre-determined. Although the purpose of the initial examinations was to allegedly determine whether the Insureds subjected to them would receive EDX tests, nearly every Insured that underwent an initial examination with the unincorporated medical practice subsequently received EDX tests through the unincorporated medical practice regardless of their presenting symptoms or signs.

114.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant

complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

115.   First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information.   When the Insureds presented to the unincorporated medical practice, they did so without any medical records.

116.   Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.   In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying such risks.

117.   Nor, by extension, was there any such risk of significant complications, morbidity, or mortality from the healthcare services provided by the unincorporated medical practice or any other healthcare professional corporations associated with the Clinics at which the Insureds were receiving "treatment."

118.   Third, in virtually every case, no medical professional associated with the unincorporated medical practice considered any significant number of diagnoses or treatment options for Insureds during the initial examinations.   Rather, to the extent that the initial examinations were conducted in the first instance, the per diem physicians made routine, predetermined "diagnoses" for every Insured, and recommended a substantially similar treatment plan for every Insured without regard to any individual Insured's actual medical condition or needs.

119.    In keeping with the fact that no medical professional ever considered a significant number of diagnoses or treatment options for the patients treating with the unincorporated medical practice, virtually every Insured received EDX tests of the upper and lower extremities.

120.    Though the Defendants routinely billed for their putative initial examinations using CPT code 99204, and thereby falsely represented that the initial examinations involved "moderate to high complexity" medical decision-making, the initial examinations clearly did not involve any legitimate medical decision-making at all.

121.    Rather, to the extent that the initial examinations were conducted in the first instance, the unincorporated medical practice generated boilerplate, predetermined "diagnoses". The predetermined diagnoses provided to Insureds were not reflective of the Insureds' actual conditions, but rather were provided solely to justify the billing for medically unnecessary or illusory electrodiagnostic testing that would later be submitted by the unincorporated medical practice.

122.    In the claims for initial examinations under CPT code 99204, the Defendants falsely represented that the initial examinations involved medical decision-making of moderate-to-high complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because CPT code 99204 is reimbursable at a higher rate than examinations that do not require moderate-to-high complexity medical decision-making.

### ii.    The Fraudulent Electrodiagnostic Testing

123.    Based upon the fraudulent, pre-determined "diagnoses" provided during the fraudulent initial examinations, the Defendants purported to subject most Insureds to a series of medically unnecessary and useless EDX tests.

124.    Like the charges for the other Fraudulent Services, the charges for the EDX tests were fraudulent in that the EDX tests (i) were medically unnecessary; and (ii) were performed – to the extent that they were performed at all – pursuant to the fraudulent treatment and billing protocol designed and implemented by the Defendants and pursuant to the improper referral and financial kickback arrangements among the Defendants and the Clinics.

125.    Although the Defendants purported to provide EMG/NCV tests to Insureds in order to determine whether the insureds suffered from radiculopathies, virtually none of the Insureds actually presented with any symptoms or signs of radiculopathy or any other serious medical problems arising from any automobile accidents.   In the unlikely event that such symptoms or signs did exist, the deficient EMG and NCV tests – to the extent they were performed at all – were incapable of properly identifying them.

126.    In actuality, the Defendants provided EMG and NCV tests to Insureds as part of the Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing that they could submit to GEICO for each Insured.

### a.    The Human Nervous System and Electrodiagnostic Testing

127.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including, the arms and legs and into the hands and feet.  Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

128.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain

to initiate muscle activity throughout the body are called motor nerves. The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

129.     The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs, including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

130.     EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

131.     The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

132.     The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation. A copy of the Recommended Policy is annexed hereto as Exhibit "2".

b.    The Fraudulent NCVs

133.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize.  The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin.

134.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

135.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform."  The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

136.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests.  Moreover, most of these peripheral nerves have both sensory and motor nerve fibers either or both of which can be tested with NCV tests.

137.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor NCV tests.  F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again.  The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

138.   According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.  See Exhibit "2".

139.   In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the Defendants routinely purported to test far more nerves than recommended by the Recommended Policy.

140.   Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Defendants routinely purported to perform: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies.

141.   Therefore, where the Fee Schedule and Recommended Policy would limit billing by the Defendants for NCV testing of one Insured to approximately $950.00, representing NCVs of three motor nerves, NCVs of two sensory nerves, and two H-reflex studies, the Defendants routinely submitted NCV billing to GEICO for more than $2,600.00 per Insured.

142.   For instance:

(i)   On or about October 8, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "FR", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.  The NCV billing totaled $2,636.44;

(ii)   On or about November 13, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "JF", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.  The NCV billing totaled $2,636.44;

(iii)   On or about September 12, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named

"MS", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.   The NCV billing totaled $2,636.44;

(iv)    On or about August 22, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "TF", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.   The NCV billing totaled $2,636.44;

(v)     On or about September 18, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "SL", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.   The NCV billing totaled $2,636.44;

(vi)    On or about August 8, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "IA", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.   The NCV billing totaled $2,636.44;

(vii)   On or about August 20, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "SD", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.   The NCV billing totaled $2,636.44;

(viii)  On or about November 7, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "DM", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.   The NCV billing totaled $2,636.44;

(ix)    On or about October 18, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "MN", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.   The NCV billing totaled $2,636.44;

(x)    On or about October 31, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "TL", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.  The NCV billing totaled $2,636.44;

(xi)    On or about September 12, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "VB", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.  The NCV billing totaled $2,636.44;

(xii)    On or about October 25, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "JV", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.  The NCV billing totaled $2,636.44;

(xiii)    On or about August 9, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "BC", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.  The NCV billing totaled $2,636.44;

(xiv)    On or about November 14, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "FM", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.  The NCV billing totaled $2,636.44;

(xv)    On or about September 5, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "HK", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98.  The NCV billing totaled $2,636.44;

(xvi)    On or about June 20, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "NR", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76;

(2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44;

(xvii)   On or about November 14, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "MC", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44;

(xviii)  On or about August 22, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "CA", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44;

(xix)    On or about July 2, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "ZK", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44; and

(xx)     On or about December 20, 2018, the Defendants submitted a bill to GEICO with respect to NCV testing administered to an Insured named "RF", which included (1) charges for NCVs of eight motor nerves totaling $1,331.76; (2) charges for NCVs of ten sensory nerves totaling $1,064.70; and (3) charges for H-reflex studies of two nerves totaling $239.98. The NCV billing totaled $2,636.44.

143.   The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

144.   In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

145.    This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

See Exhibit "2".

146.    This concept is also emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

147.    Even so, the Defendants did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

148.    Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the claims identified in Exhibit "1".

149.    In fact, during a January 31, 2019 Examination Under Oath, Sabodash indicated that the unincorporated medical practice generally provides NCVs on the same peripheral nerves and nerve fibers for each Insured.

150.    In particular, the Defendants purported to test some combination of the following peripheral nerves and nerve fibers (and in most cases, all of them) in virtually every NCV test identified in Exhibit "1":

(i)      left and right median motor nerves;

(ii)     left and right peroneal motor nerves;

(iii)    left and right ulnar motor nerves;

(iv)    left and right tibial motor nerves;

(v)  left and right median sensory nerves;

(vi)  left and right radial sensory nerves;

(vii)  left and right superficial peroneal sensory nerves;

(viii)  left and right sural sensory nerves; and

(ix)  left and right ulnar sensory nerves.

151.  The Defendants' pre-determined, boiler-plate approach to the NCVs that the Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the Defendants purported to perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that could be submitted to GEICO and other insurers in order to maximize the Defendants' ill-gotten profits.

152.  In keeping with the fact that the purported NCV tests were medically useless, the putative "results" of the NCV tests allegedly administered by the Defendants were never incorporated into any Insured's treatment plan and played no genuine role in the treatment or care of the Insureds.

153.  Furthermore, in keeping with the fact that the Defendants performed these tests pursuant to a fraudulent, pre-determined treatment and billing protocol designed to maximize profit, in some instances the Defendants billed for and purportedly performed NCV testing, but did not actually perform the EMG portion of the test.

154.  According to the Recommended Policy, both NCV tests and EMG tests normally are required for a clinical diagnosis of peripheral nervous system disorders, including radiculopathies. See Exhibit "2". As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS [Nerve Conduction Studies] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.

*       *       *

The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances.

See Exhibit "2."

155.    The Defendants occasionally billed for and purportedly performed NCV tests that were of no diagnostic value whatsoever because they were not performed in conjunction with an EMG test.

### c.    The Fraudulent EMG Tests

156.    The Defendants also purported to provide medically unnecessary EMGs to virtually all Insureds as part of their pre-determined fraudulent treatment and billing protocol.

157.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle.  The sound and appearance of the electrical activity in each such muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

158.    According to the Recommended Policy, the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is EMGs of two limbs.  See Exhibit "2".

159.    The Defendants purported to provide and/or perform EMGs to Insureds to determine whether the Insureds suffered from radiculopathies.  In actuality, the EMGs were provided – to the extent they were provided at all – as part of the Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

160.    There are many different muscles in the arms and legs that can be tested using EMGs.  The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances.  In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle.

161.    As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

162.    The Defendants did not tailor the EMGs they purported to perform to the unique circumstances of each patient.  Instead, they routinely purported to test the same muscles in the same limbs over and over again, without regard for individual patients' presentation.

163.    Furthermore, even if there were any need for any of the EMGs, the nature and number of the EMGs that the Defendants purported to provide and/or perform frequently grossly exceeded the maximum number of limbs tested – i.e., EMGs of two limbs – that are necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

164.    Nevertheless, the Defendants routinely purported to provide and/or perform EMGs on all four limbs on virtually every Insured, in excess and contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit or cause to be submitted to GEICO and other insurers, and solely to maximize the profits that they could reap from each Insured.

165.    In keeping with the fact that the purported EMG tests were medically useless, the putative "results" of the Defendants' EMG tests were not incorporated into any Insured's treatment plan and they played no genuine role in the treatment or care of the Insureds.

166.    In keeping with the fact that the Defendants performed the Fraudulent Services pursuant to a fraudulent, predetermined treatment and billing protocol designed solely to maximize profit, the unincorporated medical practice always performed (or purported to perform) the EDX tests immediately following the initial examination.  A proper neurological history and examination followed by a thoroughly conducted four-limb EMG and NCV test would require the unincorporated medical practice to spend at least two hours with each patient. The fact that each of the patients purportedly subjected to the Fraudulent Services set aside two hours to receive a neurological examination and EDX tests indicates that either: (i) the patients knew in advance that they were to receive the Fraudulent Services because the Fraudulent Services are rendered pursuant to a *pre-determined* treatment protocol, or (ii) the Fraudulent Services were not actually performed as billed.

### E.    The Fraudulent Billing for Services Provided by Independent Contractors

167.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors.  Under the No-Fault Laws, medical practices are ineligible to bill for or receive payments for goods or services provided by independent contractors – the healthcare services must be provided by the practices, themselves, or by their employees.

168.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that healthcare practices are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those

services"); <u>DOI Opinion Letter</u>, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); <u>DOI Opinion Letter</u>, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); <u>DOI Opinion Letter</u>, October 29, 2003 (extending the independent contractor rule to hospitals); <u>DOI Opinion Letter</u>, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "3").

169.     Even so, the unincorporated medical practice routinely submitted charges to GEICO and other insurers for the Fraudulent Services that were provided, to the extent they were provided at all, by independent contractors.

170.     The unincorporated medical practice treated the per diem physicians and technicians as independent contractors and not direct employees of the unincorporated medical practice.

171.     The per diem physicians and technicians that purported to render the Fraudulent Services for or on behalf of the unincorporated medical practice were not supervised by Sabodash when they rendered, or purported to render, services for or on behalf of the unincorporated medical practice.

172.     The per diem physicians and technicians that purported to render the Fraudulent Services on behalf of the unincorporated medical practice operated on a non-exclusive basis and

followed irregular schedules based on their own availability and individual desires to perform the Fraudulent Services for the unincorporated medical practice.

173.    In addition, the unincorporated medical practice paid the physicians and technicians on a per diem basis, did not require the per diem physicians and technicians to have a set work schedule, and permitted the per diem physicians and technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices.

174.    By electing to treat the per diem physicians and technicians, as independent contractors, the unincorporated medical practice realized significant economic benefits – for instance:

> (i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;
>
> (ii)    avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);
>
> (iii)   avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);
>
> (iv)    avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;
>
> (v)     avoiding the need to secure any malpractice insurance; and
>
> (vi)    avoiding claims of agency-based liability arising from work performed by the treating providers.

175.    Because the per diem physicians and technicians were independent contractors, the unincorporated medical practice never had any right to bill for or collect No-Fault Benefits in connection with the services performed by them.

176.    The unincorporated medical practice, however, billed for the services performed by the per diem physicians and technicians as if they were provided by actual employees of the

unincorporated medical practice in order to make it appear as if the services were eligible for reimbursement.

177.    The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

### F.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

178.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of charges using NF-3 forms, HCFA-1500 forms, and treatment reports through the unincorporated medical practice to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

179.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)      The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the unincorporated medical practice was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).    In fact, the unincorporated medical practice was not eligible to receive No-Fault Benefits because it was unlawfully owned and/or controlled by, and split fees with, the Management Defendants, who have never been licensed medical professionals;

(ii)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services were not medically necessary, and were performed – to the extent they were performed at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and

exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided;

(iv)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent they were provided at all – pursuant to illegal kickback arrangements among the Defendants and the Clinics; and

(v)     With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by Sabodash, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the unincorporated medical practice was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed.  In fact, the unincorporated medical practice was not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were provided by independent contractors rather than by employees of the unincorporated medical practice.

## III.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

180.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

181.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

182.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the unincorporated medical practice in an effort to prevent discovery that the unincorporated medical practice was improperly owned and controlled by non-licensed laypersons and engaged in illegal kickback, fee-splitting, and payment for referral arrangements.

183.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to fraudulent pre-determined protocols designed to

maximize the charges that could be submitted rather than to benefit the Insureds who supposedly were subjected to them. The Defendants also used billing codes for the Fraudulent Services that misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

184. In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians and technicians associated with the unincorporated medical practice in order to prevent GEICO from discovering that the physicians and technicians were actually independent contractors.

185. The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

186. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $107,382.00 based upon the fraudulent charges.

187. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
### Against Valeriy Sabodash, M.D.
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

188. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

189.   There is an actual case in controversy between GEICO and the Defendants regarding more than $911,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

190.   Valeriy Sabodash, M.D. has no right to receive payment for any pending bills submitted to GEICO because Valeriy Sabodash, M.D.'s unincorporated medical practice is improperly owned and controlled by the Management Defendants, who have never been licensed physicians, and engaged in illegal fee splitting with the Management Defendants.

191.   Valeriy Sabodash, M.D. has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services provided by the unincorporated medical practice were not medically necessary and were provided – to the extent they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

192.   Valeriy Sabodash, M.D. has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services provided by the unincorporated medical practice were provided pursuant to the illegal fee-splitting and kickback arrangements among the Defendants and the Clinics.

193.   Valeriy Sabodash, M.D. has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services provided by the unincorporated medical practice misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

194.   Valeriy Sabodash, M.D. has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services provided by the

unincorporated medical practice were provided by independent contractors, rather than by employees of Valeriy Sabodash, M.D.

195.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Valeriy Sabodash, M.D. has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
**Against Valeriy Sabodash, M.D., Anetta Kalsin, Valeriy Kotlyar, and Cloud Billing, Inc.**
**(Common Law Fraud)**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

197.    Sabodash, Kalsin, Kotlyar, and Cloud Billing intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

198.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Sabodash's unincorporated medical practice was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not eligible to receive No-Fault Benefits in that it was owned and controlled by non-physicians and illegally split fees with them; (ii) in every claim, the representation that Sabodash's unincorporated medical practice was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the healthcare practice engaged in a scheme to defraud involving illegal fee-splitting and kickback arrangements; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee

Schedule, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants; (iv) in every claim, the representation that the charges were appropriate and consistent with the service provided, when in fact the charges exaggerated the level of service and the nature of the service that purportedly was provided; and (v) in every claim, the representation that the billed-for services were provided by employees of the unincorporated medical practice, when in fact many of the billed-for services were provided by independent contractors.

199.    Sabodash, Kalsin, Kotlyar, and Cloud Billing intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the unincorporated medical practice that were not compensable under the No-Fault Laws.

200.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $107,382.00 pursuant to the fraudulent bills submitted by the Defendants through the unincorporated medical practice. The fraudulent bills and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

201.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

202.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Valeriy Sabodash, M.D., Anetta Kalsin, Valeriy Kotlyar, and Cloud Billing, Inc.**
**(Unjust Enrichment)**

203.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

204.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

205.    When GEICO paid the bills and charges submitted by or on behalf of Valeriy Sabodash, M.D. for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

206.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

207.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

208.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $107,382.00.

### FOURTH CAUSE OF ACTION
**Against John Doe Defendants "1-10"**
**(Aiding and Abetting Fraud)**

209.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

210.    John Doe Defendants "1"-"10" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Sabodash, Kalsin, Kotlyar, and Cloud Billing.

211.   The acts of John Doe Defendants "1"-"10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Sabodash's unincorporated medical practice in exchange for illegal kickbacks from the unincorporated medical practice and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

212.   The conduct of John Doe Defendants "1-10" in furtherance of the fraudulent scheme was significant and material.   The conduct of John Doe Defendants "1-10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Sabodash, Kalsin, Kotlyar, and Cloud Billing to obtain payment from GEICO and other insurers.

213.   John Doe Defendants "1"-"10" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Sabodash's unincorporated medical practice for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

214.   The conduct of John Doe Defendants "1"-"10" caused GEICO to pay more than $107,382.00 pursuant to the fraudulent bills submitted through Sabodash's unincorporated medical practice.

215.   This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

216.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

217.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Valeriy Sabodash, M.D., a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Valeriy Sabodash, M.D., has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Valeriy Sabodash, M.D., Anetta Kalsin, Valeriy Kotlyar, and Cloud Billing, Inc. compensatory damages in favor of GEICO, in an amount to be determined at trial but in excess of $107,382.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.    On the Third Cause of Action against Valeriy Sabodash, M.D., Anetta Kalsin, Valeriy Kotlyar, and Cloud Billing, Inc. compensatory damages in favor of GEICO, in an amount to be determined at trial but in excess of $107,382.00, plus costs and interest and such other and further relief as this Court deems just and proper;

D.    On the Fourth Cause of Action against John Doe Defendants "1"-"10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $107,382.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

Dated: January _13_, 2020

RIVKIN RADLER LLP

By: _____
    Barry I. Levy
    Michael A. Sirignano
    Sean Gorton
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government
Employees Insurance Company, GEICO
Indemnity Company, GEICO General
Insurance Company and GEICO Casualty
Company*